# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BRAY & GILLESPIE IX, LLC,

                    **Plaintiff,**

-vs-                            **Case No.  6:07-cv-326-Orl-DAB**

HARTFORD FIRE INSURANCE
COMPANY and WESTCHESTER
SURPLUS LINES INSURANCE
COMPANY,

                    **Defendants.**

_____

## ORDER

       This cause came on for consideration without oral argument on the following motions filed

herein:

| MOTION: | DEFENDANT WESTCHESTER'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 202) |
|---|---|
| FILED: | **January 30, 2009** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

| MOTION: | DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT (Doc. No. 203) |
|---|---|
| FILED: | **January 30, 2009** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

| MOTION: | PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 205) |
|---|---|
| FILED: | **January 30, 2009** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' MOTION TO FILE REPLY BRIEF (Doc. No. 219)** |
| **FILED:** | **March 16, 2009** |

**THEREON** it is **ORDERED** that the motion is **DENIED**. The motion seeks leave for Defendants to respond to the "egregious misstatements of the evidence and legal authority" contained in Plaintiff's opposition brief. As set forth herein, the Court finds that the *record* presents so many genuine issues of material fact that additional briefing to "correct" any misstatements Plaintiff allegedly made in its brief is unnecessary.

| | |
|---|---|
| **MOTION:** | **WESTCHESTER'S MOTION TO FILE REPLY BRIEF (Doc. No. 220)** |
| **FILED:** | **March 16, 2009** |

**THEREON** it is **ORDERED** that the motion is **DENIED** for the reasons set forth above.

This is an action under two property insurance policies for damages to the Surfside Resort and Suites ("Surfside") following three hurricanes that struck Central Florida in 2004. The parties have each filed a motion for summary judgment,[1] with incorporated memoranda and numerous attachments and exhibits. Opposition briefs have been filed, with attached exhibits (Doc. Nos. 213, 214, 216). The record also includes Defendants' Statement of Material Facts Not in Dispute (Doc. No. 204), and Plaintiff's Response to Defendants' Statement of Material Facts and Counter-statement of Material Facts (Doc. No. 215). Defendants have filed well over a dozen transcripts of depositions and Examination Under Oath (Doc. No. 206). The parties also refer to and, in part, incorporate the matters set forth in prior motions seeking other relief. *See, e.g.,* Doc. No. 213 – "Plaintiff also incorporates all of the facts set forth in its oppositions to Defendants' *Daubert* motions concerning two of B & G's experts. . ." All told, the pertinent record contains thousands of pages of deposition testimony,

---

[1]Plaintiff's motion seeks partial summary judgment, Defendants Hartford and Westchester filed a joint motion for summary judgment and Westchester filed a motion for summary judgment on issues unique to it.

exhibits, argument and occasional invective. The Court, having reviewed the record and the applicable standards of law, finds that the existence of numerous genuine issues of material fact preclude the entry of summary judgment, even in part, in either side's favor.

## Factual Background

The parties disagree as to numerous matters alleged as "fact" and differ as to the interpretation to be given to other matters acknowledged to have occurred, as is evident from a comparison of the dueling Statements of Material Facts (Doc. No. 204, 215). For present purposes, the parties agree and, where noted, disagree, as follows.[2]

*The Parties and the Policies*

This lawsuit involves a dispute over insurance coverage for the Surfside, located in Ormond Beach, Florida, now owned by plaintiff Bray & Gillespie IX, LLC ("B&G" or "Plaintiff"). Plaintiff acquired all rights to the Surfside property, including rights to insurance policy proceeds, pursuant to a cash collateral stipulation dated December 1, 2004, in Surfside's Chapter 11 bankruptcy proceeding.[3] The Hartford Fire Insurance Company ("Hartford") provided the primary property insurance coverage for the Surfside at the times relevant to this lawsuit, under policy number GW0000351, with a $10 million coverage limit of liability per occurrence, subject to the policy's terms, conditions, limitations and exclusions. Westchester Surplus Lines Insurance Company ("Westchester") provided excess property insurance coverage for the Surfside at the times relevant to this lawsuit, under policy number D3589844A 001, with coverage limits of $25 million per occurrence in excess of the $10 million coverage limit of the Hartford policy, subject to both policies' terms, conditions, limitations and exclusions. The Westchester policy "follows the form" of the Hartford policy unless the Westchester

---

[2]The Court takes these facts largely from Defendants' Statement and Plaintiff's Response.

[3]The actual transfer of ownership of the Surfside did not occur until 2005. *See* Doc. No. 205-2.

policy specifically states otherwise. The insurance policies at issue were sold to Hotel Risk Management Association, Inc. through Manning & Smith ("M&S"), an insurance agency, and Surfside was a covered property under both policies (Doc. No. 216 at 2).

*The Hurricanes*

On August 13, 2004, Hurricane Charley hit Ormond Beach. Following Hurricane Charley, on September 2, 2004, Hurricane Frances struck. On September 25, 2004, Hurricane Jeanne arrived. Surfside was damaged as a result of the Hurricanes,[4] and has remained closed since Fall 2004.

*Notice of the Claims*

The present Plaintiff acquired Surfside (and the right to bring this suit) *after* the storms, but there seems to be no dispute that Plaintiff stands in the shoes of the prior owner, with respect to actions it took following the storms. The parties agree that "immediately following the Hurricanes, Surfside Resort &Suites, Inc. noticed Hartford of the losses suffered at Surfside." (Complaint, Allegation 23, and Hartford's Answer, Allegation 23).

The record is conflicting with respect to when and how Westchester was notified. Unlike Hartford, Westchester claims that it was not notified of any loss until July 2005. While Plaintiff acknowledges that Plaintiff's broker, Wes Brandt, notified Westchester of a claim for damage to Surfside twice in July 2005, Plaintiff disputes that the notice was specific to losses caused solely by Hurricane Charley, and further contends that "Westchester also received notice when notice was provided to Hartford, VeriClaim [the adjuster] and Hartford's agent, Manning & Smith." (Doc. No. 215 at 3). The factual and legal basis of this statement is disputed.

---

[4]The exact damage caused by each storm is at issue. Also at issue is whether the occurrence of three storms in such close proximity of time is one "occurrence" under the Policies or three separate occurrences. While the parties disagree as to these matters, for the purposes of the instant motion, it is not disputed that the hurricanes caused significant damage to Surfside.

VeriClaim was the assigned adjuster named in the Hartford policy, and the Westchester Policy "follows form" and incorporates that provision. Westchester contends that, in fact, however, "it did not utilize VeriClaim as its independent adjuster to investigate the loss." (Doc. No. 216 at pp. 10-11). The status of Manning & Smith is also the subject of differing interpretations. Plaintiff contends that M&S held itself out as an agent, bound and delivered the coverage, collected the premium, and instructed that all notices of claims be submitted to it. There is evidence to support this position. The insurers dispute that M&S was their agent, contending that, in fact, M&S was the *insured's* agent. *See* Doc. No. 202 at 4, Doc. No. 204 at 15. Westchester contends that it gave no authority to M&S to bind coverage, but "does not dispute that M&S communicated generally with policyholders concerning policy terms and conditions, collected premiums and generally instructed policyholders to provide it with notice of claims. In addition, Westchester does not dispute that M&S worked with VeriClaim to determine whether to provide notice to insurers providing excess insurance policies." (Doc. No. 216 at 3). [5]

*The Claims*

In addition to factual disputes regarding notice to the insurers, the parties dispute the particulars of the claims information requested by the insurers and provided by Plaintiff. Hartford initially requested that Plaintiff submit its proof of loss for the hurricane damages in May 2005 and made numerous subsequent requests. For its part, Plaintiff contends that its lawyer was in constant communication with Hartford's lawyer and adjuster regarding the status of the submission of the proof of loss, and both counsel had agreed to hold the formal submission of the Proof of Loss "in abeyance" while documents were gathered and reviewed, and Examinations under Oath were conducted. *See*

---

[5] The record evidence supporting both interpretations is conflicting. It appears that Westchester's undisputed agent, Property Risk Services, delegated part of its authority to Manning & Smith. Whether that delegation was with the knowledge and consent of the insurers is unclear. *See* Deposition of Kristy Smith.

Deposition of Dale Kingman, pages 124-144. Complicating matters was the fact that Surfside had filed for bankruptcy and Westchester had filed a complaint in bankruptcy court against Plaintiff. (*See, generally,* Doc. No. 204-10 at p. 4). It is undisputed that Plaintiff submitted its first Proof of Loss to the insurers (the "Interim Proof of Loss") on December 18, 2006 (Doc. No. 204-3, Answer to Request for Admissions No. 6).

The Interim Proof of Loss (Doc No. 204-10) claimed loss and damage related to the windstorms in the amount of $33,266,726. The Narrative to the Proof of Loss noted that, in October 2004, Hartford provided "partial payment" of $651,000, under its policy. The Narrative also states, in pertinent part:

> Based on the numbers above, B&G's loss totals $30,233,975, the replacement cost of the present structure. Repair estimates do not adequately reflect the amount of loss – even repair estimates that include items to bring Surfside into compliance with the present Florida Building Code– *because the City of Ormond Beach Land Development Code will not allow Surfside to be repaired. As Hartford previously has been informed, the City of Ormond Beach has ordered the demolition of Surfside. . . .*
>
> Additionally, B&G has actual business interruption losses [from] the period from August 2004, through May 2006, of $3,032,751. . . business losses continue to accrue at an average of $131,858.74 per month. . . .
>
> These losses do not include any fines or penalties that have been threatened to be levied, and B&G anticipates will be levied, against B&G for Surfside remaining in non-compliance with the Ormond Beach Land Development Code. . . .
>
> In the accompanying Sworn Statements in Proof of Loss, B&G is seeking $10 million from Hartford and $2,784,396 from Westchester (the excess of the $33,266,726 over $30 million minus the deductible). *Because Surfside potentially suffered damage in three different storms, and therefore three different occurrences, B&G filed the Proof of Loss for Hartford based on the assumption of one occurrence causing the damage to Surfside and the Proof of Loss for Westchester based on the assumption of three occurrences causing the damage.*

(Doc. No. 204-10 [emphasis added]).  The parties dispute whether this Interim Proof of Loss contains misrepresentations that vitiate the coverage.

The Insurers contend that, in fact, the City of Ormond Beach had not ordered the demolition of Surfside, and there is record support for this contention.  The record contains no explicit "Order of Demolition" issued by the City, and there is deposition testimony that no such order was ever issued. (Doc. No. 206-3, Deposition of Mike Garrett, pp. 55 and 92).  On the other hand, the City posted a sign dated August 16, 2004, which stated that the building was deemed unsafe for human occupancy. Plaintiff asserts that the posting, along with a September 15, 2004 letter from the City directing that Surfside be "repaired or demolished" within 60 days, constituted a *de facto order* to demolish, in view of Plaintiff's asserted belief that it was not economically feasible to repair the premises due to the severity of the damage.  Defendants hold no such interpretation.  *Compare* Doc. No. 204 at p. 5 - paragraphs 16-18, with Doc. No. 215, pp. 7-8, paragraphs 15-18.    Moreover, although the Proof of Loss refers to fines it expects to be levied by the City against B&G due to non-compliance with the Code, the parties agree that the City never levied any fines against Plaintiff for failing to demolish or repair the Surfside.[6]

The parties disagree as to the factual basis of numerous contentions pertinent to the formulation of the Proofs of Loss, remediation of any loss, proof of any damages and issues relating to calculation of same, interpretation of the Policy provisions, and various equitable contentions, large and small.  Against this complex background, the parties bring their motions.

## Summary Judgment Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454,458

---

[6]Plaintiff contends that the statement in its Proof of Loss was an error and "not an intentional misstatement." (Doc. No. 215 at p. 9).

(11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

# Issues and Analysis

Three motions have been filed, presenting the Court with numerous issues, including but not limited to:

1) what constitutes "notice" of a claim under the Policies and was appropriate notice given?

2) the relationship of M&S to the parties - was M&S Plaintiff's agent, Defendants' agent, both or neither? Do the facts support a finding of apparent agency?

3) the significance (if any) of the filing of the Interim Proof of Loss well after the storms; was the filing impermissibly tardy, timely, or excused?

4) the meaning of the word "demolish" and does the City's actions constitute a "de facto order" of same?

5) does the Interim Proof of Loss contain intentional misrepresentations that bar coverage, or mere innocent, non-material mistakes?

6) whether Plaintiff's damage claim is supported by the facts (with numerous sub-issues such as can Plaintiff estimate the cost of Furniture, Fixtures and Equipment)? What is the appropriate period of restoration and can it be (and was it) tolled? Was the May 2005 document prepared by a structural engineering firm just a proposal or was it a structural report? Did the experts calculate damage estimates correctly?

7) were the damages to the Surfside the result of one "occurrence" or three?

Resolution of these issues necessarily involves the application of the "facts" to the applicable law, and the facts material to these issues are in sharp dispute. As will be seen, in such a scenario, summary judgment is not available.

**Westchester's Motion (Doc. No. 202) and Plaintiff's Motion (Doc. No. 205)**

Westchester raises three issues which it contends entitle it to judgment as a matter of law. As phrased by Westchester:

> 1. The insurance contract issued by The Hartford Fire Insurance Company ("Hartford"), to which Westchester policy follows form, requires notice of a loss be given "as soon as practicable after any loss or damage occurring under this policy…" The first of the three hurricanes allegedly causing damage to plaintiff's property occurred on August 13, 2004. Plaintiff did not provide notice of loss to Westchester until July 18, 2005, nearly a year after the storm. This notice was untimely as a matter of law.
>
> 2. Westchester has no payment obligation to plaintiff until Hartford has paid its full coverage limits under the "exhaustion" provision of the Westchester policy. Hartford has not paid its limits and Westchester's obligations under the policy have not been triggered.
>
> 3. Any claim for damages caused by mold is specifically excluded by the Westchester insurance policy.

(Doc. No. 202).

In its motion, Plaintiff cross-moves for partial summary judgment in its favor on the notice issue raised by Westchester, namely, whether Plaintiff failed to promptly provide notice of its claim and is therefore barred from recovery. Although both parties seek judgment as to this issue, neither is entitled to it.

*Notice to Westchester*

Under Florida law,[7] a failure to provide timely notice of loss in contravention of a policy provision is a legal basis for the denial of recovery under the policy. *See Ideal Mut. Ins. Co. v. Waldrep*, 400 So.2d 782, 785 (Fla. 3d DCA 1981) ("Notice is necessary when there has been an occurrence that should lead a reasonably prudent man to believe that a claim for damages would arise."). Moreover, the failure to give timely notice creates a rebuttable presumption of prejudice to the insurer. "If the insured breaches the notice provision, prejudice to the insurer will be presumed,

---

[7]The parties agree that Florida law controls this dispute, which is before the Court pursuant to diversity jurisdiction.

but may be rebutted by a showing that the insurer has not been prejudiced."*Bankers Insurance Co. v. Macias,* 475 So. 2d 1216 (Fla. 1985). The determinations of (i) whether the notice provision was complied with and (ii) what is a reasonable time under the surrounding circumstances are questions of fact. *Ideal Mut. Ins. Co.,* 400 So.2d at 785.

In order to prevail on this contention, a party must therefore show that there are no genuine issues of material fact regarding 1) what the Policy required with respect to notice, 2) when notice was provided, within the meaning of the Policy and Florida law, 3) whether notice was timely, and 4) whether prejudice exists, either by operation of the unrebutted presumption or otherwise. Neither side can carry that burden on this record.

The Westchester Policy had no explicit provision that pertained to notice. Rather, as an excess policy, the Westchester Policy followed the form of the Hartford Policy, which provides:

> **NOTICE OF LOSS**
> As soon as practicable after any loss or damage occurring under this policy is known to the Insureds' home office insurance department, the Insured shall report such loss or damage with full particulars for transmittal to this Company.

(Doc. No. 204-5, paragraph 28).

By its terms, then, the issue is whether notice to Westchester was made "as soon as practicable." Under Florida law, application of this specific policy language is for the jury:

> The Rule in Florida appears to be that the term 'as soon as practicable' as used in the notice provision of the insurance policy means that notice is to be given within a reasonable time in view of all the facts and circumstances of each particular case. *Morton v. Indemnity Ins. Co. of North America*, 137 So.2d 618 (Fla.2d Dist.Ct.App.1962), *State Farm Mut. Auto. Ins. Co. v. Ranson*, 121 So.2d 175 (Fla.2d Dist.Ct.App.1960).
>
> All of the Florida cases bearing upon the question of the requirement of notice being given to the insurer seem to be uniform in the proposition that what is a reasonable time depends upon the surrounding circumstances and is ordinarily a question of fact for the jury.

*Renuart-Bailey-Cheely Lumber & Supply Co. v. Phoenix of Hartford Ins. Co.*, 474 F.2d 555, 557 (5th Cir. 1972), *citing Hendry v. Grange Mutual Casualty Co.,* 372 F.2d 222 (5th Cir. 1967).[8]

Here, as the above background indicates, the "surrounding circumstances" are replete with factual disputes regarding when notice was required to be given to this excess carrier,[9] whether notice to the carrier's adjuster (if, indeed, VeriClaim was Westchester's adjuster) was notice to the carrier, the role of M&S, whether Westchester had actual notice, and whether any prejudice resulted. While some contentions can be readily disposed of,[10] material disputed factual issues remain, precluding the granting of summary judgment on this issue.

*Exhaustion*

Westchester argues, correctly, that it is not liable to pay under its Policy until the Hartford Policy limits have been exhausted; an event which has not occurred. Thus, contends Westchester, it cannot yet be liable as a matter of law. While the Court agrees in principle with this contention, as far as it goes, the Court disagrees that the failure to exhaust Hartford policy limits to date means no suit can be brought against Westchester on the excess Policy. As pointed out by Plaintiff, there is a genuine issue of material fact with respect to whether the three Hurricanes were a single occurrence (as Plaintiff contends) or three separate occurrences (as Westchester believes). The parties sharply dispute the proper measurement of damages owed, with Plaintiff claiming an amount that, if awarded,

---

[8]The decisions of the United States Court of Appeals for the Fifth Circuit as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, are binding as precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

[9]For example, Plaintiff has presented evidence which, if credited, shows that Plaintiff did not know the extent of the claimed damage would implicate the Westchester policy until 2005, after certain reports were concluded. As "the duty to provide notice arises when a reasonable person, viewing all available facts and information, would conclude that an award implicating the policy is likely,", Westchester has not established, for purposes of summary judgment, when the duty to notify Westchester first arose. *See Harbor Ins. Co. v. Trammell Crow Co.*, *Inc.* 854 F.2d 94, 99 (5th Cir. 1988). Absent a finding as to exactly when the duty to notify arose, the Court cannot determine that notice was untimely as a matter of law.

[10]Plaintiff's contention that Westchester's incorporation of the Hartford Policy language calls for notice only to Hartford is disingenuous and without any legal or evidentiary support.

exceeds the Hartford limits and implicates Westchester's Policy. As Plaintiff has alleged a claim under the Westchester Policy, Westchester cannot claim immunity from this suit. There is a difference between a condition precedent to liability and a condition precedent to litigation.[11] The motion is denied as to this issue.

*Mold damages*

Westchester's last contention is that it is entitled to summary judgment with respect to any claim for damages caused by mold, because such a claim is expressly excluded by the Westchester Policy. Plaintiff does not disagree, but notes that the mold exclusion is inapplicable as it "is not seeking separate relief for mold damages." (Doc. No. 214 at 18). Westchester is not entitled to summary judgment on a claim that is not asserted.

As genuine issues of material fact preclude the entry of summary judgment on the notice issue, and Westchester cannot establish that it is entitled to judgment on the remaining two issues, Westchester's motion for summary judgment is **DENIED,** as is Plaintiff's motion for partial summary judgment.

## Defendants' Joint Motion (Doc. No. 203)

In their joint motion, Defendants contend that they are entitled to summary judgment on four issues, which they frame as follows:

- Both Hartford and Westchester's policies contain clauses that forfeit the coverage in the event of misrepresentation or concealment of material facts by the insured. Plaintiff represented to defendants that there was an order from the City of Ormond Beach requiring that the building must be demolished; that it had an engineering report declaring the building structurally unsound; and it represented to Hartford that the hurricane damages were caused by only one "occurrence" while representing to Westchester that the hurricane damages were caused by three occurrences. All of these representations are material and demonstrably false. As such, coverage under the policies is forfeited as a matter of law.

---

[11]To some extent, the excess insurer's place in the litigation is akin to that of a third party defendant in that its liability is only triggered should the plaintiff prevail against the original defendant.

- Plaintiff's claim that the Surfside property must be razed and rebuilt is based purely on speculation regarding how the City of Ormond Beach might apply the relevant building and land development codes and should be rejected as a matter of law.

- Plaintiff's claim for business interruption damages should be denied as a matter of law because plaintiff's calculation fails to incorporate a "period of restoration" as required by the policy and because it incorporates speculative assumptions unsupported by the record.

- Plaintiff's claim for damages to furnishings, fixtures, and equipment ("FF&E") should be denied as a matter of law because Plaintiff's calculation is a guess and is not based on any evidence.

(Doc. No. 203). Plaintiff contests the factual and legal basis for each contention. The Court addresses each issue, in turn.

*Misrepresentation*

The Hartford Policy contains the following provision concerning concealment, misrepresentation and fraud:

**This policy does not insure against**:

a.    Any fraudulent or dishonest act or acts committed by the Insured or any of the Insured's employees, meaning only dishonest or fraudulent acts committed by the Insured or the Insured's employees with the manifest intent to:

1. cause the Insured to sustain such loss; and

2. obtain financial benefit for the Insured, Insured's employee, or for any other personal organization intended by the Insured or the employee to received such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment.

(Hartford Policy, Doc. No. 204-5).

The Westchester Policy contains the following provision concerning concealment, misrepresentation or fraud:

## COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

### A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
1. This Coverage Part;
2. The Covered Property;
3. Your interest in the covered Property; or
4. A claim under this Coverage Part.

(Doc. No. 204-6).

Although the Policy language differs, both Policies prohibit intentional acts of concealment, misrepresentation or fraud. Such provisions are enforceable under Florida law. *See e.g., Wong v. State Farm Fire and Casualty Co.,* 685 So. 2d 1002 (Fla. 3d DCA 1997) ("no question" similar provision is enforceable if insured makes intentional misrepresentation); *Nova Hills Villas Condominium Ass'n, Inc. v. Aspen Speciality Insurance Co.,* 2008 WL 179878 (S.D. Fla. 2008) (collecting cases). Not every misstatement qualifies as fraud. In order to prevail on this portion of their motion, Defendants must establish the absence of any genuine issue of material fact on the question of whether any "misrepresentations" were *intentional* acts of fraud. This is not a negligible burden.

In *Badger Mut. Ins. Co. v. Morgan,* 313 F.2d 783 (5th Cir. 1963), the Fifth Circuit affirmed a judgment in an insured's favor, rejecting a claim by the insurer that the insured was guilty of fraud as a matter of law in filing his proof of loss, as evidenced by the fact that the jury awarded significantly less than the insured claimed.

-15-

In *Soler & Company, Inc. v. United Firemen's Insurance Co. of Philadelphia*, 299 U.S. 45, 57 S.Ct. 54, 81 L.Ed. 30 (1936), the insured submitted a proof of loss of $35,000.00 and sued for the full amount. The jury returned a verdict in favor of the insured and set the value at $17,000.00. The insurer claimed that the verdict fixing the value of the property at less than one-half of the amount claimed in the proof of loss established a fraudulent overvaluation in the proof of loss as a matter of law. The Supreme Court rejected this contention saying:

'We cannot accept the view that a conclusive presumption of fraud arose because the verdict was far less than the amount stated in the proof of loss. If the bill of exceptions be disregarded we must assume the jury was properly instructed-- were told that condition 12 required a verdict for the insurer 'if the claim be in any respect fraudulent.' The finding for the assured indicates that they discovered no fraud. *Policy holders may present inaccurate proofs of loss without conscious dishonesty or intent to defraud; different views of values are common; memory is faulty; insurance company and assured often entertain widely different views concerning the policy; and evidence cannot always be produced to establish something declared to be true in entire good faith.'*

The Court went one step further and stated that the fact there was absolutely no proof whatever of an item claimed by the insured in his proof of loss, did not establish fraud as a matter of law.

*Badger Mut. Ins. Co. v. Morgan,* 313 F.2d 783, 786 (5th Cir. 1963) (emphasis added). *See also Chaachou v. American Century Ins. Co.,* 241 F.2d 889, 893 (5th Cir. 1957) ("This presents no danger that valuable rights will be lost by mere mistakes or errors in calculations, exaggerations in the amounts of the claims, or the assertion, even though doubtful, of coverage or other contentions as to all or particular items when these flow from the mistaken good faith judgment or opinion of the assured or his agents. . . . For the courts will, as did the District Court here, make it positive that the insurer must satisfy the heavy burden of establishing that the conduct complained of was done and was a willful, purposeful misrepresentation of facts having substantial materiality under circumstances to which the law would attribute the intention to defraud, . . . that is, cheat, deceive and cause the insurer to do other than that which would have been done had the truth been told") (internal citations omitted); *Morgan v. Badger Mut. Ins. Co.,* 181 F.Supp. 496, 499 (N. D. Fla. 1960), *aff'd,* 313 F. 2d 783 (5th

Cir. 1963) ("It is also well established that a mere overestimate of value of goods lost in a fire, error in judgment with respect to fixing a value, mistake, or inadvertence, will not render the insurance contract void. Since reasonable men might differ as to the values they place on certain objects, the severity of the rule voiding policies of insurance would not obtain unless the proof of the false swearing was such that no other conclusion could be drawn.")

Here, Defendants assert that three representations were made that were material, demonstrably false, and made with the requisite fraudulent intent. The record, however, does not allow the Court to make those findings as a matter of law.

*1. The representation that the City had ordered the Surfside to be demolished*

While certain facts relating to this representation are undisputed (there is no "order of demolition"), the material facts pertinent to a finding of intentional misrepresentation are actively at issue. Specifically, Plaintiff has presented evidence that, if believed by the fact finder, tends to negate a finding of intent to mislead. There is evidence that the City "red tagged" the building as unsafe and uninhabitable shortly after the storm, and Surfside received a 60 day order to "repair or demolish" the Property. Plaintiff's principal testified in deposition that the 60 day order to "repair or demolish" was interpreted by Plaintiff to be a *de facto* order to demolish the Surfside because "it was impractical to fix it." (Deposition of Joseph Gillespie, Doc. No. 213-3, pp. 68-69). There is evidence that the City's officials were themselves not entirely clear as to exactly what the City required and whether demolition would be necessary (*See* Deposition of Clay Ervin, Doc. No. 206-2, pp. 131-134).[12] Plaintiff also asserts that it demolished a similar situated building (with the consent of that insurer), which, too, was "red tagged" by the City; thus (allegedly) bolstering its belief that, if the building was

_____

[12]The City took a "wait and see" approach; placing the burden on the Property owner to provide a structural analysis of the Property, prior to the City making a determination as to whether the Property could be rebuilt (Deposition of Clay Ervin, pgs. 39-40, 54).

not readily repairable, it must be demolished. While Defendants assert that it is "unreasonable" for Plaintiff to interpret the "repair or demolish" letter as a demolition order, that determination must be made by a jury.[13] Construing these facts and drawing all inferences in Plaintiff's favor, the Court finds a genuine issue of material fact regarding whether this representation was an intentional misrepresentation sufficient to vitiate coverage. A demolition "order" from a municipality whose various officials are applying and enforcing multiple codes through interpretations and decisions made on the basis of changing conditions and information over the course of time often lack precision, clarity and definiteness. An arguable mischaracterization of the municipality's position is a dubious basis for asserting a defense of fraud to a claim under an insurance policy.

2. *The engineering report*

Defendants next assert that during the Examination Under Oath, Joseph Gillespie stated that Plaintiff "was waiting for a report from a structural engineering firm, PSI, Inc., which was supposed to indicate the structural damage sustained to the property" (Doc. No. 203 at 15, citing Gillespie EUO, pp. 19-20, 28). It is undisputed that no structural engineering report was provided in the Interim Proofs of Loss. Defendants assert that Plaintiff "concealed" a May 4, 2005, "Limited Structural Condition Survey Report" prepared by PSI that concluded that the hotel structure was "in generally fair condition" and "the false representation made by plaintiff concerning the submission of a structural engineering report by PSI and Plaintiff's concealment of the May 2005 PSI report were material to the analysis and handling of plaintiff's claim."

---

[13]Defendants contend that such repair or demolish letters "do not constitute a demolition order under Florida law," citing *Magaldi v. Safeco Ins. Co. of America,* 2008 WL 409697 (S.D. Fla. 2008). Defendants' reliance on this case for that proposition is misplaced. The Court in *Magaldi* **denied** summary judgment, "because there is a disputed issue of fact on whether demolition was mandated by the Town of Jupiter acting under proper authority of law. . ." *Id.*

Nothing in the March 14, 2006 EUO supports an interpretation that at that time there existed, and Plaintiff concealed, a PSI report indicating structural damage. The cited provisions read as follows:

> Q. You said that PSI has not done a report, though, yet; is that correct?
> A. I haven't seen a report.
> Q. Do you know if they've done a report?
> A. It's my understanding that they're working on an analysis.
> Q. Has PSI reached any preliminary or final conclusions?
> A. I have no knowledge of that.

Examination Under Oath of Joseph Gillespie, March 14, 2006, at 19-20.

> Q. . . Would I – would Sloan know more information about what PSI is doing and whom else may have been retained to do things? I mean, if you say, Gerry, I got to go out and I'll find out for you, are you just going to call up and talk to Sloan?
> A. I would – he's involved in doing, you know, different things on different issues. I would probably still be the best person. I could research it and find out where we are.
> Q. How long would it take to do that, to research it and find out where we are?
> A. You're waiting on a report? I don't know when that report will be finished.
> Q. When you say "research," I mean, you're waiting for a report?
> A. Correct.
> Q. And that report's from PSI?
> A. That's my understanding.
> Q. Okay. Do you know when that report is going to be done?
> A. In the foreseeable future.

Examination Under Oath of Joseph Gillespie, March 14, 2006, at p. 28.

Gillespie's sworn statement indicates that, as of March 2006, to the best of his knowledge, PSI was working on an analysis, but no report had yet issued. This is consistent with the averments in the Affidavit of Dale L. Kingman (Doc. No. 213-23), counsel to Plaintiff. Kingman avers that he obtained permission to retain a structural engineering firm in September-October 2005 and contacted PSI. Kingman maintains that PSI and Plaintiff drafted a consulting agreement and "it was not until mid-January 2006 that PSI and B&G completed the contract, and PSI was able to do an initial Phase I non-destructive investigation of the Surfside." *Id*. Kingman confirms that PSI's work was "put on hold"

in March/April 2006 and "[u]p to that point in time, PSI, to my knowledge, had not issued any report concerning its findings on the characterization of the structural integrity of the Surfside...". *Id.*

The record contains what purports to be a letter dated May 4, 2005, from PSI to Chris Lipke of Ocean Resorts (Doc. No. 204-18). That document, which is the subject of much dispute between the parties, purports to provide a "Limited Structural Condition Assessment" on the Surfside, along with "our proposed scope of services." *Id.* While the document does note that the "hotel structure is in generally fair condition," the assessment qualifies that "our limited survey was visual in nature and did not include any testing or destructive investigation." Importantly, the document does not purport to provide a formal structural analysis; noting that "[t]he hotel would need to be gutted to the structure so an as-built survey and structural analysis could be performed." *Id.* While the parties may disagree as to the evidentiary impact of this document, the Court cannot find on this record, as a matter of law, that this document is the structural engineering report Gillespie was referring to in his EUO, nor that it was "concealed" by Plaintiff with an intent to misrepresent. Rather, it appears just as likely (if not more so) that PSI prepared an initial once-over for Chris Lipke and was then retained by Plaintiff to provide a more detailed formal report which, apparently, was put on hold. Regardless, the meaning of this document is a significant issue[14] of material fact, and serves to preclude summary judgment on this issue.

As the record does not compel a conclusion as a matter of law that Plaintiff provided false statements with respect to this document, nor that Plaintiff knowingly concealed the same from Defendants, the motion for summary judgment on this point is denied.

---

[14] If the 2005 document was a mere proposal, as opposed to a "report," the materiality of the document is also at issue.

*3. One "occurrence" or "three"*

Defendants' last misrepresentation contention is that "Plaintiff's Interim Proofs of Loss falsely stated the number of occurrences which form the basis of its claim." (Doc. No. 203 at 17). Defendant contends: "Plaintiff asserted in its 'interim' sworn proofs of loss to Hartford that the damages to the Surfside property were the result of Hurricane Charley. Plaintiff asserted in the 'interim' sworn proof of loss to Westchester that the damages to the Surfside property were the result of Hurricanes Charley, France [sic] and Jeanne." *Id.*

Both the Interim Sworn Statement in Proof of Loss submitted to Hartford and the Interim Sworn Statement in Proof of Loss submitted to Westchester contain the following identical provision:

> 1. **Time & Origin:** <u>Three windstorms, named Hurricanes Charley, Frances, and Jeanne</u> occurred on <u>August 13-14, September 3-4, and September 25-26, 2004.</u> The cause and origin of said loss, as a result of the Windstorms, the insureds sustained damage to <u>Real and Personal Property and business interruption loss.</u> The business interruption and income loss is continuing and will continue to accrue.

(Doc. No. 204-10 at pp. 1 and 2, emphasis original).

In the accompanying Narrative, Plaintiff sets forth the dates the three storms hit and the resulting damage, including a statement that "Hurricanes Charley, Frances, and Jeanne did extensive damage to Surfsides's interior and exterior." (Doc. No. 204-10 at pp. 3-4). Plaintiff's position is that the windstorms (plural) caused damage to the Property. Defendants, however, claim fraud based (apparently) on the following statement, which is also included in the Narrative:

> In the accompanying Sworn Statements in Proof of Loss, B&G is seeking $10 million from Hartford and $2,784,396 from Westchester (the excess of the $33,266,726 over $30 million minus the deductible). Because Surfside potentially suffered damage in three different storms, and therefore three different occurrences, B&G filed the Proof of Loss for Hartford based on the assumption of one occurrence causing the damage to Surfside and the Proof of Loss for Westchester based on the assumption of three occurrences causing the damage.

(Doc. No. 204-10 at 6).

Plaintiff did not "falsely state the number of occurrences that form the basis of the claim." It stated that three windstorms struck the Property within a month and a half and caused extensive damage and "because Surfside potentially suffered damage in three different storms, and therefore three different occurrences" it made certain disclosed and defined "assumptions" in filing its Proof of Loss. While the insurers may disagree with those assumptions and are free to challenge them at trial, the mere *stating* of *assumptions,* readily defined as such by Plaintiff, is not "fraud." Indeed, Defendants offer no evidence that a statement with respect to assumptions was intended to mislead either insurer, especially as both insurers received the same Narrative accompanied by a letter from counsel seeking to arrange a meeting to discuss the loss and, specifically, whether the loss is attributable to one, two or three occurrences. *See* Doc. No. 213-14.

In finding that this statement does not constitute misrepresentation as a matter of law, the Court is not finding that Plaintiff's assumptions are factually correct, nor that Plaintiff is entitled to recover on its claim presented in this fashion. Whether the damage to the Surfside was caused by one or more occurrences is a disputed issue for trial. Rather, the Court finds that there is no fraud in setting forth an assumption, clearly labeled as such, even if that assumption ultimately proves to be inaccurate.

Defendants' Joint Motion for Summary Judgment based on misrepresentation is denied.

*Plaintiff's Claim that the Codes Require Rebuilding*

Defendants next contend that they are entitled to summary judgment as to Plaintiff's damages claim in that it is based on "rank speculation." As support for this contention, Defendants cite several Florida cases. While the Court does not quarrel with the general position that damage claims must be properly supported, none of the cases cited by Defendants present facts similar to this case and none affirmed a summary judgment decision finding damages speculative as a matter of law. *See Florida*

*Outdoor, Inc. v. Stewart,* 318 So. 2d 414 (Fla. 2d DCA 1975) (appeal from a non-jury verdict and judgment awarding damages for anticipated loss of profits); *Swindell v. Crowson,* 712 So. 2d 1162 (Fla. 2d DCA 1998) (reversing judgment after trial for unjust enrichment); *Smith v. Austin Dev. Co.,* 538 So. 2d 128 (Fla. 2d DCA 1989) (appeal from final judgment after non-jury trial- suit for damages for breach of lease); *Shadow Lakes, Inc. v. Cudlipp Construction & Dev. Co., Inc.,* 658 So. 2d 116 (Fla. 2d DCA 1995) (appeal of jury award in breach of contract case); and *Hold v. Manzini,* 736 So. 2d 138 (Fla. 3rd DCA 1999) (reversing a summary judgment holding that a general release barred a claim for legal malpractice).[15]

The Court accepts, as stated in *Smith, supra,* that Florida courts require evidence of claimed damages:

> Although uncertainty as to the amount of damages, or difficulty in proving the exact amount, will not preclude recovery, there must be some reasonable basis in the evidence to support the amount awarded. *Clearwater Associates v. Hicks Laundry Equipment Corp.*, 433 So.2d 7 (Fla. 2d DCA 1983); *Adams v. Dreyfus Interstate Dev. Corp.*, 352 So.2d 76 (Fla. 4th DCA 1977). Furthermore, it is incumbent upon the party seeking damages to present evidence to justify an award of damages in a definite amount. *United Steel & Strip Corp. v. Monex Corp.*, 310 So.2d 339 (Fla. 3d DCA 1975).

*Smith*, 538 So.2d at 129. It is against this standard that the Court reviews the record.

Defendants assert that Plaintiff is not entitled to damages for the cost of razing and rebuilding the Property because Plaintiff never submitted any plans or requests for permits to the City so that the City could make a determination as to whether the building could be repaired and/or which codes would apply to such a rebuild. Defendants, however, fail to point to any Policy provision or legal requirement mandating this submission, and the record contains evidence that such a submission was

---

[15] At issue in *Hold* was when a legal malpractice claim accrues. There was no determination made regarding damages, as the trial court held that the action was barred due to a signing of a release. The Court fails to see the relevance of the *Hold* case to the case at bar.

thought to be futile, in view of the estimated cost of repair. *See, e.g.,* Deposition of Joseph Gillespie (Doc. No. 213-3). This disputed issue is not properly amenable to summary judgment.

Defendants also take issue with the so-called 50% rule and with the opinions expressed by Plaintiff's experts, basically reiterating the matters set forth in their *Daubert* motions. As the Court noted in its Order denying those motions, however, "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Doc. No. 221, quoting *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1311 (11th Cir. 1999). This is a fight over the weight of evidence, and that is the jury's province.

The existence of disputed material issues of fact compels a denial of the motion with respect to whether Plaintiff's damage claim is speculative.

*Business Interruption Claim*

Defendants next assert that they are entitled to summary judgment with respect to Plaintiff's claim for business interruption loss, "[b]ecause the predictions of plaintiff's future profits are based upon speculative and unsupported information, which has no relationship to the Surfside property's prior earnings history, and does not account for a period of recovery as required by the policy . . . [and] Plaintiff has produced no other evidence to prove its alleged business interruption damages." (Doc. No. 203 at 31). Plaintiff contests this assertion, raising numerous factual and legal arguments in its papers.

The Court has already dealt directly with these contentions in Defendants' *Daubert* motion to exclude the testimony of Stan Johnson, CPA, with respect to Plaintiff's business interruption loss. In denying that motion, the Court noted:

Defendant contests the proffered testimony's reliability because Johnson "failed to verify the contents of the profit and loss statements upon which he based his entire business interruption calculation, overstated the occupancy rate used as the basis for the projected loss, and failed to inquire about the nature of the expenses shown in the profit and loss statements." The Court has carefully read Defendants' argument and concludes that even if Defendants are correct about Johnson's actions (a conclusion that is disputed by Plaintiff) these are issues that go not to the admissibility of the opinion, but instead are fodder for cross examination and rebuttal.

Defendants do not challenge the methodology of the calculations (e.g., that such items as the occupancy rate, the profit and loss statements or expenses are not relevant to the analysis); rather, Defendants take issue with whether Johnson used correct numbers. In other words, Defendants assert that Johnson failed to perform the correct method correctly. This is not grounds for excluding the testimony under *Daubert*. *See Quiet Technology*, 326 F.3d at 1345-46 (using incorrect numbers in a reliable formula is not grounds for exclusion). *The particular issue of limiting the damage calculation with respect to a period of restoration is a matter of factual and legal dispute in this case. Doubtless, it will be the subject of various proofs and arguments at trial. The finder of fact, properly instructed, can consider Mr. Johnson's opinions in light of whatever facts are found in that regard.*

(Doc. No. 221 [emphasis added]). Defendants' arguments with respect to business interruption loss are no more persuasive in a summary judgment setting. This issue must be resolved at trial. The motion, with respect to business interruption, is **denied.**

*Plaintiff's Claim for Damages to Furnishings, Fixtures and Equipment*

Defendants assert that they are entitled to summary judgment with respect to Plaintiff's claim for loss due to furnishing, fixtures, and equipment ("FF&E") damaged in the hurricanes. The parties agree that the FF&E claim of $2,359,845.00 was calculated by taking the total amount spent on FF&E at another hotel, dividing it by the number of rooms in that hotel to get a per room average, and then multiplying the per room average by the number of rooms in the Surfside (Doc. No. 203 at 32 - citing to Stipulated Fact Number 32 in Defendant's Statement of Material Facts, Doc. No. 204, and Doc. No. 215 – Plaintiff's Response). Defendants contend that "Plaintiff's valuation of its FF&E claim has no bearing at all to the actual damaged contents at the Surfside property and ignores the fact that there

were furnishings, fixtures, and equipment that were salvaged and undamaged" and, thus, Plaintiff's claim fails as a matter of law (Doc. No. 203 at 31-32). In essence, Defendants attack the methodology of computing the loss. Summary judgment is unwarranted.

Even if the Court were to credit the assertion that Plaintiff's methodology is flawed, this does not warrant a conclusion that, as a matter of *law*, Plaintiff's entire FF&E claim fails. Indeed, Defendants do not contest that, pursuant to the Hartford Policy (to which Westchester Policy follows form), coverage is provided for personal property loss and further:

> 11. VALUATION
> At the time of loss, the basis of adjustment shall be as follows:
> …
> G. Other property not otherwise provided for: At replacement cost new; if the property is not repaired, rebuilt or replaced with similar property on the same or another site, the Company shall not be liable for more than actual cash value (with proper deduction for depreciation) of the property destroyed.
> All to be computed at the place of loss.

(Hartford Policy, Section 12(G)).

While it is stipulated that Plaintiff has not yet repaired or replaced the FF&E, there is a genuine issue of fact with respect to whether the Surfside Property itself is to be repaired or demolished. Moreover, even if Plaintiff could not show entitlement to replacement cost on this record, a conclusion the Court need not reach, the Policy terms allow for "actual cash value" with proper deduction for depreciation. While Defendants assert, without citation, that "[d]etermination of actual cash value requires a detailed listing of what personal property was damaged, the age of each item, and an estimate of what it was worth, or the cost to repair, at the time it was damaged, properly accounting for depreciation" (Doc. No. 203 at 33), Florida courts and federal courts applying Florida law on this issue apply a far more lenient standard of proof:

> In order to establish to what extent an insurer is liable where "actual cash value" is the yardstick used to determine damages, it is necessary to determine what criteria is to be

used to define this phrase. In *New York Central Mutual Fire Ins. Co. v. Diaks*, Fla.1954, 69 So.2d 786, the Supreme Court indicates that in these matters Florida will adhere to the so-called "Broad Evidence Rule." Under this rule, any evidence logically tending to establish a correct estimate of the value of the damaged or destroyed property may be considered by the trier of facts to determine "actual cash value" at the time of loss. Where, as in this case, evidence of the wholesale cost of the destroyed merchandise is presented, it constitutes relevant evidence of actual cash value.

*Worchester Mutual Fire Insurance Co. v. Eisenberg,* 147 So. 2d 575, 576 (Fla. 3rd DCA 1962); *cited in Berkshire Mut. Ins. Co. v. Moffett,* 378 F.2d 1007, 1010-1011 (5th Cir. 1967); *see also J&H Auto Trim Co., Inc. v. Bellefonte Ins. Co.,* 677 F. 2d 1365 (11th Cir. 1982) (applying Florida's "liberal" broad evidence rule and noting that under the rule, a fact-finder could consider replacement cost, wholesale cost, and the owner's testimony, among other factors); *Barrett v. Prudential Property and Casualty Ins. Co.,* 790 F. 2d 842, 845 (11th Cir. 1986) (citing Florida's broad evidence rule and finding: "The original purchase price of the house, its rental value, the proof of loss statement, and the contractor's estimate all constituted relevant, probative evidence from which a jury could logically base a determination as to the actual cash value of the destroyed property.") Indeed:

> Where the existence of damages has been established, recovery will not be denied because such damages are difficult to ascertain. While damages may not be determined by mere speculation or guess, it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference. A reasonable basis of computation and the best evidence which is obtainable under the circumstances of the case and which will enable the trier of the facts to arrive at an approximate estimate of the loss is sufficient.

*Berkshire Mut. Ins. Co., supra*, 378 F.2d at 1011-1012.

Here, Plaintiff has submitted a claim for coverage offered under the Policies and has submitted evidence of that claim which meets the liberal admissibility standard under the broad evidence rule. Defendants are free to counter that evidence with rebuttal of the testimony or their own estimates. As Defendants challenge goes to the weight of that conflicting evidence, however, it is not a summary

judgment issue but a matter of disputed fact for the jury's consideration. Summary judgment is **denied** on these grounds.

## Conclusion

For the reasons set forth above, all of the motions for summary judgment are **denied**. The motions for leave to file a reply brief are also **denied.**

**DONE** and **ORDERED** in Orlando, Florida on May 27, 2009.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record